# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39711**

**Misc. Dkt. No. 2021-03**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Matthew P. LEIPART**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Review for Petition for New Trial Pursuant to Article 73, UCMJ

Decided 26 January 2023

———————————

*Military Judge:* Jefferson B. Brown (arraignment and motions hearing); Joseph S. Imburgia (trial); Christina M. Jimenez (*DuBay* hearing).

*Approved sentence:* Dishonorable discharge, confinement for 21 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 29 November 2018 by GCM convened at Whiteman Air Force Base, Missouri.

*For Appellant:* Major David L. Bosner, USAF; Mark C. Bruegger, Esquire; Andrew Cherkasky, Esquire; Catherine M. Cherkasky, Esquire.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Charles B. Dunn, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel Dayle P. Percle, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, POSCH, and CADOTTE, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge POSCH joined. Judge CADOTTE filed a separate dissenting opinion.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone found Appellant[1] guilty, in accordance with his pleas, of one specification of aggravated assault, two specifications of assault consummated by a battery, and two specifications of wrongfully communicating threats in violation of Articles 128 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 928, 934.[2,3] Contrary to Appellant's pleas, the military judge found Appellant guilty of two specifications of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920.[4] The military judge sentenced Appellant to a dishonorable discharge, confinement for 21 years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the adjudged sentence.

Appellant initially raised nine issues on appeal: (1) whether his convictions for sexual assault are legally and factually sufficient; (2) whether trial counsel's closing argument improperly shifted the burden of proof; (3) whether Appellant's sentence is inappropriately severe; (4) whether the provision of an erroneous personal data sheet to the convening authority warrants a new opportunity for Appellant to request clemency; (5) whether Appellant is entitled to sentence relief due to unreasonable post-trial delay; (6) whether Appellant's guilty pleas were involuntary; (7) whether Appellant's sentence is inappropriately severe in comparison to closely related cases; (8) whether Appellant received ineffective assistance of counsel in several respects; and (9) whether

---

[1] The Appellant in *United States v. Leipart*, ACM No. 39711, also has a petition for a new trial before this court, *United States v. Leipart*, Misc. Dkt. No. 2021-03. The two matters are substantially intertwined, and we address them together in this opinion. For simplicity, we will refer to Appellant/Petitioner as "Appellant."

[2] Unless otherwise indicated, all references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] Appellant was charged with two specifications of wrongfully communicating threats on divers occasions. Appellant pleaded guilty to one of these specifications as charged, but excepted the words "on divers occasions" from his guilty plea to the other specification and pleaded not guilty to the excepted language. The Government did not attempt to prove the excepted language. The military judge found Appellant guilty in accordance with his pleas and not guilty of the excepted language.

[4] The military judge found Appellant not guilty of three other specifications of sexual assault and one specification of wrongfully communicating a threat.

Appellant's mandatory dishonorable discharge is unconstitutional.[5] While Appellant's case was pending review at this court, Appellant submitted a petition for a new trial pursuant to Article 73, UCMJ, 10 U.S.C. § 873, on the grounds of newly discovered evidence and that the named victim, KC, committed fraud on the court-martial.

This court returned the record to The Judge Advocate General and ordered a post-trial hearing in accordance with *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam), to answer a number of specified questions. *See United States v. Leipart,* No. ACM 39711, Misc. Dkt. No. 2021-03, 2021 CCA LEXIS 595 (A.F. Ct. Crim. App. 14 Jun. 2021) (order). After some delay, the hearing was held at Fort Leavenworth, Kansas, and the record—including the transcript and exhibits from the *DuBay* proceedings—was returned to this court. Appellant subsequently asserted nine additional assignments of error arising from the *DuBay* hearing: (10) and (11) address whether the military judge at the *DuBay* hearing (*DuBay* judge) erred in her findings of fact in two respects; (12) whether trial defense counsel were ineffective in allowing the military judge who presided at the trial (trial judge) to "consider" Appellant's guilty plea for purposes of findings; (13) whether the *DuBay* judge erred by failing to disclose her participation in an upcoming "high profile case" in which one of the trial defense counsel was also involved; (14) whether the Government committed a prejudicial discovery violation; (15) whether Appellant was denied the right to due process because military courts lack subpoena power in Australia; (16) whether trial defense counsel were ineffective in failing to impeach KC's credibility; (17) whether KC's lack of credibility in her testimony at the *DuBay* hearing demonstrates Appellant's convictions for sexual assault were legally and factually insufficient; and (18) whether Appellant is entitled to relief for unreasonable appellate delay arising from the *DuBay* hearing.[6] Appellant subsequently moved to submit a further assignment of error, which this court allowed over the Government's opposition: (19) whether Appellant was deprived of the right to a unanimous verdict guaranteed by the Sixth

---

[5] Appellant personally raised issues (6), (7), (8), and (9) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[6] We have renumbered these additional issues for clarity. Appellant personally raised issues (13), (14), (15), (16), (17), and (18) pursuant to *Grostefon*, 12 M.J. at 431.

Amendment,[7] the Fifth Amendment's[8] Due Process Clause, and the Fifth Amendment right to equal protection.[9]

We have carefully considered issues (4), (9), (13), (14), (15), and (19) and find they do not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). With regard to the remaining assignments of error and the petition for a new trial, we have consolidated our analysis of several separately raised but closely related issues in our opinion below. We find no error materially prejudicial to Appellant's substantial rights and a new trial is not warranted, and we affirm the findings and sentence.

## I. BACKGROUND

### A. Events in Missouri

In January 2016, KC—an Australian citizen and lawyer who lived in the vicinity of Perth, Australia—met Appellant through an online dating website. At the time, KC was separated from her then-husband JH, also an Australian lawyer, and was in the process of obtaining a divorce. Appellant was a divorced father of three stationed at Whiteman Air Force Base (AFB), Missouri. KC and Appellant soon began communicating daily. In March 2016, KC traveled to the United States to meet Appellant and stayed with him at his home in Sedalia, Missouri, for "two to three weeks." KC then returned to Perth; soon after she left Missouri, KC discovered she had become pregnant.

KC informed Appellant of her pregnancy and they made plans to become a family. KC returned to Missouri in May 2016 and stayed until approximately July 2016 before she returned to Australia prior to the expiration of her visa. KC returned to Missouri in August 2016 to stay with Appellant again and remained until December 2016. KC and Appellant were married in Missouri in September 2016, and their son ML was born prematurely in Missouri in November 2016. KC returned to Australia with ML in December 2016; Appellant accompanied them to Australia and remained there for approximately two weeks before he returned to Missouri.

At Appellant's trial, KC described four alleged instances of sexual assault that Appellant committed against her in 2016 while she was in Missouri. KC testified the first of these instances occurred during her second stay in Missouri between May and July 2016. KC testified that as she was preparing to get

---

[7] U.S. CONST. amend. VI.

[8] U.S. CONST. amend. V.

[9] We have renumbered this issue, which Appellant personally raised pursuant to *Grostefon*, 12 M.J. at 431.

dressed after a shower, Appellant sexually assaulted her in his bedroom by penetrating her vagina with his penis without her consent. The trial judge found Appellant not guilty of this alleged sexual assault.

KC described a second alleged sexual assault that occurred in August or September 2016. KC testified that as she and Appellant were in his bedroom and preparing to go out, Appellant began grabbing her breasts. Appellant then pushed her face-down onto the bed. Despite KC repeatedly telling him "no" and crying, Appellant penetrated her vagina with his penis without her consent. KC testified that although the sexual assault was very painful, afterwards she "pretended like it didn't happen," and they went out together as planned. The trial judge found Appellant guilty of this sexual assault.

KC described a third alleged sexual assault that occurred in September or October of 2016. KC testified she was in the kitchen in Appellant's home when Appellant entered the room and abruptly "shoved" three of his fingers in her vagina. KC asked Appellant what he was doing, and Appellant stopped and walked away. The trial judge found Appellant not guilty of this alleged sexual assault.

KC testified a fourth alleged sexual assault occurred in approximately October 2016. KC and Appellant had gone to a medical appointment to check on the progress of KC's pregnancy. When they returned to Appellant's home, Appellant pushed her onto the bed. KC, who felt sore in her vaginal area after the appointment, protested and told Appellant "no." According to KC, Appellant responded to the effect that he was "entitled to have sex with [her]" because she was his wife. Appellant then pulled KC's pants off, pushed her on her back, held her legs up, and penetrated her vagina with his penis. KC testified that, despite the fact KC was crying and told Appellant to stop and that he was hurting her, Appellant "went quite hard and fast, until he ejaculated." Afterward, KC experienced bleeding from her vagina. The trial judge found Appellant guilty of this sexual assault.

**B. Events in Australia**

KC did not report these alleged sexual assaults to anyone before she returned to Australia in December 2016. Despite these incidents, KC had a general plan with Appellant to remain married and eventually reunite as a family. However, according to KC their relationship worsened as 2017 progressed. KC had stopped working as an attorney in May 2016 after she became pregnant. KC had paid for her own airline tickets to and from the United States, but when she returned to Australia she was largely dependent on her mother and public assistance for support. Appellant sent KC significant amounts of money to help support her and their son ML, but over time Appellant became increasingly resentful of how KC used the money. In addition, according to Appellant's

statements during his guilty plea inquiry, he became suspicious that KC was "cheating" on him and that she wanted to end the marriage.

Appellant returned to Australia in May 2017 and stayed with KC and KC's mother for approximately three weeks. It was during this general time frame that the assaults and most of the wrongful threats to which Appellant pleaded guilty occurred. KC secretly made audio recordings of several incidents during which Appellant was verbally or physically abusive toward her. Later at Appellant's court-martial, during the trial judge's guilty plea inquiry, Appellant admitted that while he was with KC in Australia, he threatened her more than 20 times, including threats to kill her, "choke" her, and break her bones. Appellant also threatened KC with violence if she did not repay him the money he had given her. Appellant also acknowledged a separately charged threat that occurred by phone just before he traveled to Australia in May 2017; he admitted on that occasion he told KC, "[f]or all I know you're f[**]king screwing around, and messaging other people, that's why, [KC], when I get out there, I'm going to disfigure you, so that nobody wants you." Appellant admitted to the trial judge that by "disfigure" he meant to damage KC's physical appearance "so no guy ever wants [her and] so she can't have any more children." Appellant also admitted to "choking"[10] KC in Australia by putting his hand and his arm around her neck on two separate occasions, and to striking KC in the head as they were traveling together in a car. In addition, on one occasion in Australia Appellant held the point of a screwdriver to KC's neck as he was "yelling" at her that "she better tell [him] everything . . . that she did [wrong] to [him] during the relationship."

At trial, KC testified that Appellant attempted to sexually assault her in Australia in May 2017. KC described being with Appellant in a bedroom in her mother's home in Perth when he pushed her onto the bed and attempted to pull her pants down. KC resisted by holding her pants up and telling him "no." According to KC, on this occasion Appellant desisted before he removed her pants; she thought this might have been because Appellant heard KC's mother in the adjoining room. The trial judge granted a defense motion for a finding of not guilty pursuant to Rule for Courts-Martial (R.C.M.) 917 with respect to the charged sexual assault, and the trial judge entered a finding of not guilty with

---

[10] Appellant was charged with, pleaded guilty to, and described to the military judge "unlawfully grab[bing] and chok[ing] [KC] with his hand and his arm" on "divers occasions." Counsel for the parties informed the military judge they agreed the specification covered two such incidents, one during which Appellant put his hand around KC's neck and one during which he put his arm around her neck. We note Appellant's actions might be more aptly described as "strangling" KC rather than "choking" her; nevertheless, we find Appellant's guilty plea was provident and his convictions for assaulting KC with his hand and arm legally sufficient.

respect to the lesser included offense of attempted sexual assault in violation of Article 80, UCMJ, 10 U.S.C. § 880.

After Appellant returned to Missouri, he and KC continued to argue about money and other topics. However, KC also sent Appellant "naked" images of herself and text messages that were complimentary of Appellant; KC later explained at trial she did so because Appellant instructed her to. At some point between May and July 2017, KC decided to divorce Appellant. On 31 July 2017, KC informed Appellant that she wanted full custody of ML and offered to forego any financial support from Appellant if he would relinquish his "rights." Appellant did not accept this proposal and accused KC of "kidnapping" ML.

The following day, 1 August 2017, KC went to the Australian police with her mother and reported that Appellant had threatened and assaulted her in the past, and that she was afraid he would return to Australia to harm her because he had threatened to do so. KC described threats and physical assaults by Appellant between May and July 2017, but she did not report any sexual assaults or attempted sexual assaults at that time.

## C. Investigation and Court-Martial

After KC made her initial report to the Australian police, in August 2017 KC's mother used the Whiteman AFB public website to send a message to the Air Force public affairs office to report Appellant had physically assaulted KC in Australia. Public affairs referred the report to security forces. As a result, Investigator JM with security forces interviewed KC by telephone in August 2017.[11] The purpose of the interview was to gather more information about the physical assault KC's mother had reported. KC did not inform Investigator JM of any sexual assault or attempted sexual assault during the 15 August 2017 interview.

Although the exact circumstances are not clear from the evidence at trial, at some point the Air Force Office of Special Investigations (AFOSI) became involved in the investigation of Appellant. KC provided the AFOSI several recordings she had made of Appellant threatening or assaulting her. In September 2017, AFOSI agents at Whiteman AFB interviewed KC in Australia by a recorded video call. Prompted by comments Appellant made in one of the audio recordings KC had provided, approximately 40 minutes into the interview Special Agent (SA) TK asked a question to the effect of whether Appellant had committed any sexual offense against KC. KC responded that the Australian police had not asked her that directly, and estimated there were approximately ten occasions when KC did not want to have sexual intercourse and Appellant

---

[11] At the time of Appellant's trial, Investigator JM had separated from the Air Force and was employed as a civilian police officer.

had "just done it." She told SA TK she could not specifically recall every instance, but she generally described the May 2017 incident in Australia, described above, and four other occasions in Missouri. At the conclusion of the interview KC agreed to prepare a written statement for the AFOSI. KC eventually provided a signed, sworn statement dated 3 January 2018.

On 30 March 2018, the convening authority referred the charges and specifications for trial by general court-martial. An arraignment and preliminary motions hearing was held on 2 July 2018, and Appellant's trial and sentencing took place 27–29 November 2018.

### D. Proceedings in Australia Related to KC's Practice of Law

Throughout her relationship with Appellant, KC had been undergoing scrutiny by the Western Australia Legal Profession Complaints Committee (LPCC) regarding three matters related to her practice of law. Two of these matters related to complaints from former clients regarding KC's representation as a criminal defense attorney between 2013 and 2015. The third related to KC's involvement with a former police detective, CC, who had unlawfully accessed confidential police records to provide information to KC between 2008 and 2013. CC was investigated by a body known as the Corruption and Crime Commission (CCC). As a result of the CCC investigation, in July 2015, CC was sentenced to nine months in confinement pursuant to a guilty plea. Although KC provided testimony and documents during the investigation of CC, KC herself was not charged nor the subject of a criminal investigation.

On 9 December 2015, an LPCC complaints officer notified KC by letter that she would be investigated for her conduct related to CC's unlawful access of restricted information. As noted above, KC ceased practicing law after she became pregnant, but retained her status as an attorney. The LPCC completed its investigations of KC by September 2017 and referred the matters to an administrative proceeding known as the State Administrative Tribunal (SAT). The SAT formally initiated proceedings in May 2018. On 6 September 2018, KC participated in mediation with the LPCC in an attempt to resolve the matters pending before the SAT. As a result, KC and the LPCC reached an agreement that KC would not seek to renew her local practicing certificate before 30 June 2019. However, the substantive proceedings before the SAT remained open at that time and were still open at the time of Appellant's trial in late November 2018.

Relevant post-trial developments with respect to the SAT proceedings are described below in additional background related to Appellant's petition for a new trial.

## II. DISCUSSION

### A. Legal and Factual Sufficiency of Sexual Assault Convictions

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (internal quotation marks and citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). Moreover, "an accused can properly be convicted of a sexual offense on the word of a single victim alone." *United States v. Prasad*, 80 M.J. 23, 31 (C.A.A.F. 2020). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Appellant's convictions for sexual assault in violation of Article 120, UCMJ, required the Government to prove: (1) that at or near the locations alleged, on or about the dates alleged, Appellant committed a sexual act upon KC by penetrating her vulva with his penis; and (2) that Appellant did so by causing bodily harm, to wit: penetrating KC's vulva with his penis without her consent. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 45.b.(3)(b). "'[B]odily harm' means any offensive touching of another, however slight,

including any nonconsensual sexual act . . . ." Article 120(g)(3), UCMJ, 10 U.S.C. § 920(g)(3).

### 2. Analysis

The Government introduced sufficient evidence for a rational factfinder to find Appellant guilty beyond a reasonable doubt of both sexual assaults of which he was convicted. With regard to the August/September 2016 incident in Appellant's bedroom, KC testified she was getting dressed as they prepared to go out together when Appellant began grabbing her breasts. Appellant then pushed her onto the bed face-down. KC did not want to engage in sexual intercourse, and when she protested Appellant became "angry" and pushed her face into the bed. Despite KC repeatedly telling Appellant "no" and crying "hard," Appellant penetrated her vagina with his penis until he ejaculated. With regard to the October 2016 incident, KC testified she and Appellant returned to Appellant's house from a medical appointment when he pushed her onto the bed. When KC asked Appellant what he was doing and told him "no," Appellant responded to the effect that he was "entitled" and it was his "right" to have sex with her. Appellant pulled her pants off, pushed her legs up, and penetrated her vagina with his penis "quite hard and fast." KC testified it was "quite painful," and she cried, told Appellant he was hurting her, and asked him to stop. However, Appellant continued until he ejaculated. Based on KC's testimony, the trial judge could find beyond a reasonable doubt on each occasion Appellant penetrated KC's vulva with his penis by causing bodily harm, specifically by penetrating her vulva without her consent.

As at trial, Appellant raises several arguments as to why KC's testimony regarding the sexual assaults was not credible. We address the most significant of these in turn.

#### a. KC's Delayed Reporting of the Sexual Assaults

First, Appellant notes that during KC's first two reports to law enforcement—to the Australian police and to Investigator JM—she did not allege Appellant sexually assaulted her. It was not until during the AFOSI interview when SA TK specifically asked KC about possible sexual offenses that KC reported sexual assaults. As at trial, Appellant puts particular emphasis on Defense Exhibit A, a printed "Detected Incidents Report" created by the Western Australia Police during or after her report to them on 1 August 2017. The report has a number of fields for data entry, including a field titled "Account" where KC and Appellant's relationship is summarized and which includes allegations of verbal and physical abuse and threats by Appellant against KC. Other fields on the form reflected that KC reported being afraid Appellant would kill or injure her, and that she and Appellant had been separated for two months. However, a field titled "Sexualised Behaviour" contains a "No"

response to the question, "Does the Perpetrator do/say/threaten things of a sexual nature that makes the Victim feel bad or physically hurts the Victim in some way?" Appellant contends this report indicates KC not only did not report sexual assault to the Australian police, but "likely" affirmatively denied sexual assault.

However, a rational factfinder could reasonably discount this argument. The trial judge could have credited KC's explanation that she did not report the sexual offenses to law enforcement earlier because she found it humiliating to talk about, and because the motivation for her to go to the police was her fear for her physical safety in light of Appellant's recent physical abuse in May 2017 and Appellant's threats to return to Australia to kill or injure her. Moreover, KC explained that she considered the physical assaults—particularly Appellant threatening her with a screwdriver and holding it to her neck while he interrogated her and demanded repayment of his money—to be Appellant's most serious crime. The trial judge may have further noted that when SA TK *sua sponte* prompted KC regarding the possibility of sexual assaults, KC was able to identify multiple distinct instances on which Appellant allegedly performed sexual acts on KC without her consent. The Defense entered the video recording of KC's AFOSI interview in its entirety into evidence; we have reviewed it and find KC's statements therein to be generally credible.

Furthermore, specifically with regard to the "Detected Incidents Report," the trial judge may have reasonably credited KC's testimony that the Australian police did not directly ask her whether Appellant had ever sexually assaulted her. The report is not a statement per se; it was not created nor signed, much less sworn to, by KC. Essentially it appears to be an electronic form filled in by a police officer based on the information KC provided; thus, the trial judge could reasonably conclude the "Sexualised Behaviour" field was marked "No" because KC simply had not reported such information on that occasion, not because she affirmatively denied it. Moreover, even if the trial judge believed it was possible KC actually denied sexual offenses on that occasion, he might reasonably conclude such a denial at that point did not materially undermine the credibility of her trial testimony in light of the totality of the evidence and circumstances.

### b. Motive to Fabricate

Appellant contends the child custody dispute over ML that had developed by the end of July 2017 provided KC a strong motive to fabricate the sexual assault allegations. As described above, by that point KC had informed Appellant she wanted a divorce and offered to relinquish any claim to financial support provided Appellant surrender his "rights" regarding ML; for his part, Appellant accused KC of "kidnapping" their son. However, a rational factfinder might have found the manner in which the sexual assault allegations emerged

undermined this defense argument. KC did not initially accuse Appellant of any sexual offense. Instead, she reported his threats and physical assaults which caused her to fear for her safety, and of which she had audio-recorded evidence. The sexual assault allegations emerged during her interview with AFOSI only because SA TK specifically asked KC about any sexual offenses after SA TK heard Appellant refer to having forced himself on KC in one of the audio recordings. The trial judge could reasonably conclude these circumstances indicated it was not KC's plan to use false allegations of sexual assault in any child custody dispute.

### c. KC's Continuation of the Relationship

Appellant contends it is not credible that KC would have paid thousands of dollars to return to the United States and paid for Appellant to travel to Australia with her and ML if, as she testified, Appellant began sexually assaulting her during her second trip to Missouri from May to July 2016. However, in general, a rational factfinder—applying their common sense and knowledge of the ways of the world—could reasonably conclude KC's decision to continue her relationship with Appellant despite occasional instances of sexual abuse by her intimate partner/spouse was believable. KC testified that in the early stages of their relationship and marriage Appellant was not always abusive toward her, and that she preferred to act as though the sexual assaults had not occurred because she wanted to form a family with Appellant and ML.

Similarly, the trial judge could reasonably conclude KC's acknowledgment that she sent Appellant complimentary messages and "naked" images of herself in June 2017 after Appellant had returned to the United States did not materially undermine her testimony regarding the sexual assaults. KC explained that she sent these messages and images because Appellant instructed her to do so, because he said it was "what a good wife would do." The trial judge could reasonably credit KC's explanation and discount these communications, which came after Appellant's physical assaults in May 2017 and amidst ongoing threats from Appellant.

### d. Inability to Specify Dates

Appellant contends KC's inability to identify specific dates on which the alleged sexual assaults occurred undermines her credibility. Although KC could offer only a general time frame for when each assault occurred, in her descriptions she associated each assault with particular circumstances—such as getting dressed in preparation for going out together, or having just returned from a medical appointment, or being in an advanced stage of pregnancy which made the penetration particularly awkward and painful. A rational factfinder could conclude that KC, who was intent on continuing the relationship despite the sexual assaults, would not have made any effort to

memorialize them. Instead, the trial judge could reasonably have found persuasive KC's ability to recall the circumstances of each incident rather than recite specific dates.

### 3. Conclusion as to Legal and Factual Sufficiency

Having given full consideration to these and other arguments raised by Appellant, and drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's sexual assault convictions. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that the trial judge personally observed the witnesses and we did not, we also find the evidence factually sufficient.

## B. Ineffective Assistance of Counsel

Appellant contends his trial defense counsel were ineffective in multiple respects, including: (1) allowing the military judge to "consider" Appellant's guilty pleas with regard to the litigated sexual assault specifications; (2) failing to use certain electronic media to impeach KC's trial testimony; and (3) failing to use the 9 December 2015 letter from the LPCC complaints officer to KC to impeach KC's trial testimony.[12,13] We address each contention below.

### 1. Additional Background

#### a. Trial Judge's Awareness of Guilty Plea

As noted above, Appellant pleaded guilty to one specification of aggravated assault against KC, two specifications of assault consummated by a battery against KC, and two specifications of wrongfully communicating threats to KC in violation of Articles 128 and 134, UCMJ. Before the trial judge inquired into the providence of Appellant's guilty pleas, he advised Appellant that by pleading guilty Appellant would give up three important rights, including the right against self-incrimination. However, the trial judge further explained Appellant would give up these rights "only with respect to those offenses to which

---

[12] Appellant also asserts trial defense counsel were ineffective for failing to interview certain potential witnesses. Trial defense counsel responded to these assertions in their declarations and their *DuBay* hearing testimony. We find this particular assertion of ineffective assistance does not require discussion or warrant relief. *See Matias*, 25 M.J. at 361. To the extent Appellant's declaration also suggests trial defense counsel rendered ineffective assistance in advising him to plead guilty to the Article 128 and 134, UCMJ, offenses, we similarly find this contention does not require discussion or relief. *See id.*

[13] With the exception of the trial judge's consideration of Appellant's guilty pleas, Appellant personally asserts these ineffective assistance claims pursuant to *Grostefon*, 12 M.J. at 431.

[Appellant] pled guilty. [Appellant] still ha[d] the rights with respect to the other offenses."

During the Defense's opening statement, civilian trial defense counsel (Mr. DC) at certain points briefly referred to the fact that Appellant had entered "mixed pleas" and the military judge had "already heard some [information] from the [p]rovidence inquiry . . . ." After Mr. DC concluded his opening statement, he had the following colloquy with the trial judge:

> [Trial Judge]: But you had mentioned in your opening statement about the mixed pleas, the guilty pleas, and one of the questions I was going to ask you, regardless of that, is your position -- from the defense team -- on consideration, or the fact-finder being aware that there has been previous guilty pleas? I think your opening statement probably answered the question, because now you've alerted to me in your opening statement. But, I still want to give you the opportunity to bring that up.

> [Mr. DC]: Yeah, I think in a mixed plea in front of a panel type fact-finder, sometimes we would have the optionality of certainly disclosing to the members the existence of the plea. I thought that it was appropriate in the opening statement here, because you're going to hear prior inconsistent statements in impeachment, based on the 15 August statement to [sic] [KC]. And in that particular statement, the reference in opening statement was, she talks about the content of the mixed plea, but not these additional charges and specifications. So to the extent, *I wasn't necessarily asking you to, as the fact-finder, to necessarily consider that mixed plea. But, I was alerting you to the fact of what you're going to hear on the cross-examination, if she made statements that are similar to that.* I hope that answers your question, sir.

> [Trial Judge]: It does.

> [Mr. DC]: I'm not trying to be nonresponsive.

> [Trial Judge]: No, that's responsive.

> [Mr. DC]: Okay.

> [Trial Judge]: That answers the question.

> Anything else on that issue from you the [G]overnment?

> [Trial Counsel]: No, Your Honor, I was going to ask the Court the same question, so thank you.

> [Trial Judge]: So we're operating in a world where I'm aware of the previous guilty plea?
>
> [Mr. DC]: Of course, sir; yes.
>
> [Trial Judge]: I mean, obviously I am as the judge but even as the fact-finder now --
>
> [Mr. DC]: Yes, sir.
>
> [Trial Judge]: -- I'm aware of it.
>
> [Mr. DC]: Then obviously, I certainly appreciate your thoroughness in compartmentalizing your various functions here, but I agree that we're in that universe now.

(Emphasis added).

During trial counsel's argument on findings he noted, "The defense counsel asked you to operate in this world where you know that [Appellant] pled guilty to a number of offenses." Trial counsel argued this knowledge showed that KC had been truthful when she alleged Appellant had assaulted and threatened her. Trial counsel contended the confirmation that KC had been truthful with respect to these uncontested offenses tended to enhance her credibility regarding the litigated sexual assault specifications.[14]

As noted above, the military judge entered mixed findings as to the litigated specifications, ultimately finding Appellant guilty of two specifications of sexual assault and acquitting him of three specifications of sexual assault.

### b. Digital Evidence in the Possession of the Defense

On appeal, Appellant submitted a declaration to this court in which he asserted, *inter alia*, trial defense counsel failed to make effective use of certain digital evidence to impeach KC's testimony regarding the alleged sexual assaults. Appellant stated that before trial, at his own expense, he employed an expert in digital forensics to extract "hundreds of messages between himself and [KC], none of which referenced sexual assault." Appellant stated that he provided trial defense counsel two disk drives each containing many thousands of files related to such messages.

Appellant stated the first drive contained approximately 10,000 files including messages dated after KC alleged Appellant had assaulted her. These included messages stating that KC loved and missed Appellant, and some contained "sexually charged" language and pictures. According to Appellant, some messages addressed finances and that Appellant questioned how KC spent

---

[14] We describe trial counsel's argument in more detail in our analysis of the Government's closing argument, *infra*.

money he sent her. Appellant further stated he had an email from KC to CC, the former Australian police detective, in which KC asked CC if it was "possible" for him to "grab" a "police report form" for her. Appellant states trial defense counsel "did not use hardly any" of the material from this drive, although he also concedes Mr. JC's cross-examination of KC "utilized some of the information from this drive." Appellant attached to his declaration a "sample" of the text messages, as well as a copy of the email between KC and CC and a copy of the 9 December 2015 letter from the LPCC complaints officer to KC.

Appellant asserted the second drive contained approximately 20,000 files related to messages between Appellant and KC "sent around [the time of] the alleged incidents" of sexual assault. Appellant asserted these messages included no allegations by KC that Appellant had "forced her to do anything against her will," and instead included messages in which KC was affectionate and called him a good husband. Appellant contended there were also messages discussing his "PTSD," which Appellant now considers evidence that KC was "probing [him] for information." Appellant asserted trial defense counsel did not use any information from this drive. He further contended they did not return the drive to him and it is "apparently gone;" Appellant did not attach any sample messages from this drive to his declaration.

This court ordered responsive declarations from Appellant's three trial defense counsel, and received such declarations from Mr. DC and Captain (Capt) CB.[15] In addition, all three trial defense counsel testified at the *DuBay* hearing. Relevant portions of their responses to Appellant's claims of ineffective assistance are discussed in our analysis below.

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true,

---

[15] The *DuBay* hearing also explored the circumstances of Mr. JC's failure to respond to the court's order, which are unnecessary to describe for purposes of this opinion.

and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* (quoting *Strickland*, 466 U.S. at 694).

In a court-martial where the accused has pleaded guilty to some but not all of the charged offenses, neither the guilty plea itself nor any related statements as to one offense may be "admitted to prove any element of a separate offense." *United States v. Flores*, 69 M.J. 366, 369 (C.A.A.F. 2011). A military judge is "presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted).

### 3. Analysis

#### a. Allowing the Trial Judge to be Aware of the Guilty Pleas

Appellant asserts Mr. DC's agreement to allow the trial judge to "consider" his guilty pleas as the trier of fact was "patently erroneous" and without any useful purpose for the Defense. Moreover, Appellant contends he was significantly prejudiced because the guilty pleas corroborated KC's allegations regarding the Article 128 and 134, UCMJ, offenses, and thereby tended to enhance KC's credibility as to the litigated specifications.

In his declaration Mr. DC stated:

> There is no indication the Military Judge used the providence inquiry for any improper basis. I do not believe there was uncharged misconduct in the providence inquiry. There may have been alternative theories for the admissibility of many aspects of the providence inquiry. The purpose of the mixed plea was because the evidence on those specifications was uncontroverted and to obtain credibility with the military judge. Permitting the judge to consider [Appellant's] testimony for any proper purpose he desired seemed in [Appellant's] best interest.

During the *DuBay* hearing, Mr. DC further explained that based on prior experience he had "very positive opinions" of the trial judge, he wanted to maintain "credibility" with the trial judge, and he had no doubt the trial judge would use the information "appropriately." However, Mr. DC agreed with appellate defense counsel's assertion that Mr. DC had "allow[ed] the judge to consider that *Care* inquiry [with] no limitations on how he is to consider that . . . ." Mr. DC conceded that if he had the situation to do over again, he "probably" would not make the same decision. For his part, Capt CB stated that he was not part of any prior discussion regarding the trial judge's awareness of the guilty plea, and that he was "confused" by Mr. DC's agreement to it because it "immediately corroborated" KC. Appellant's other civilian trial defense counsel, Mr. JC, recalled having a pretrial conversation with Mr. DC about the military judge's awareness of the guilty plea during findings, but otherwise provided little information on the subject.

In order to properly analyze Appellant's claim of ineffective assistance, we must focus on the record rather than Appellant's characterization of the record. On appeal, and at the *DuBay* hearing, the Defense repeatedly referred to Mr. DC having allowed the trial judge to "consider" Appellant's guilty plea and providence inquiry during findings. However—notwithstanding that Mr. DC, to an extent, and Capt CB, to a greater extent, appear to have accepted Appellant's characterization—the record does not indicate that, at the time, Mr. DC agreed the trial judge would "consider" the guilty plea, nor is that what the trial judge proposed to do. Instead, the trial judge indicated that he would be "aware" of the guilty plea, not that he would consider or use the guilty plea during his deliberations on findings. This distinction is significant.

Our superior court has explained that using Appellant's guilty plea or providence inquiry as evidence with regard to a contested offense would be wholly improper and facially a violation of Appellant's Fifth Amendment rights. In *Flores*, the United States Court of Appeals for the Armed Forces (CAAF) explained that "[i]n a guilty plea context, a military judge who has advised an accused that she is waiving her right against self-incrimination only to those offenses to which she is pleading guilty cannot later rely on those statements as proof of a separate offense." 69 M.J. at 368 (citation omitted). Neither the guilty plea itself nor any related statements as to one offense may be "admitted to prove any element of a separate offense." *Id*. at 369. "To do so would compel an accused to incriminate herself in the separate criminal proceeding," *id*. at 370, as well as undermine the providence of the guilty plea.

As in *Flores*, in the instant case the trial judge advised Appellant that he had waived his right against self-incrimination only as to the offenses to which he pleaded guilty. We do not hold that the fact of a guilty plea and finding may never be mentioned during the contested portion of the trial. However, we

interpret *Flores* to prohibit a military judge who has so advised an accused from then using the guilty plea or inquiry to bolster a witness's credibility with respect to a separate contested charge.[16]

Absent clear evidence to the contrary, a military judge is presumed to know and to follow the law. *Erickson*, 65 M.J. at 225. We find no clear evidence to the contrary in this record. At no point did the trial judge indicate he would *consider* or *use* either the guilty plea itself or Appellant's providence inquiry during the contested portion of the trial. On the contrary, the trial judge had advised Appellant he would not do so.

Notwithstanding trial defense counsel's post-trial statements, at the time, Mr. DC indicated that he "wasn't necessarily asking [the trial judge] to, as the fact-finder, to necessarily consider that mixed plea." Instead, Mr. DC referenced the fact that, in a mixed-plea case with court members, the military judge would typically ask the defense whether the accused wanted the members to be "informed" of the guilty pleas. *See* Department of the Army Pamphlet 27-9, *Military Judges' Benchbook* (*Benchbook*), ¶ 2-5-4 (10 Sep. 2014).[17] The purpose of such information is not, of course, that the court members should use the fact of the guilty plea as evidence for their findings as to contested offenses. In Appellant's case, as Mr. DC explained at the time, the evident purpose of allowing the trial judge to be "aware" of the mixed plea was simply to help orient the trial judge, as factfinder, to how the expected evidence related

---

[16] Additionally, we do not hold that an accused may never agree to the use of his providence inquiry during findings. If an accused did agree, however, in circumstances such as these, at a minimum the military judge would have to reopen the *Care* inquiry and explain to the accused that—contrary to the military judge's prior specific advice to the accused—the defense had now proposed the inquiry would potentially be used to prove elements of separate offenses. *See United States v. Resch*, 65 M.J. 233, 237 (C.A.A.F. 2007) ("Military law imposes an independent obligation on the military judge to ensure that the accused understands what he gives up because of his plea and the accused's consent to do so must be ascertained.").

[17] If the defense requested that the court members be informed of the guilty pleas, the version of the *Benchbook* in use at the time of Appellant's trial provided the following model instruction:

> The court is advised that findings by the court members will not be required regarding the charge(s) and specification(s) of which the accused has already been found guilty pursuant to (his) (her) plea. I inquired into the providence of the plea(s) of guilty, found (it) (them) to be provident, accepted (it) (them), and entered findings of guilty. Findings will be required, however, as to the charge(s) and specifications(s) to which the accused has pled not guilty.

*Benchbook*, ¶ 2-5-4 (10 Sep. 2014).

to both the contested and uncontested specifications, as described in the Defense's opening statement. Had the trial judge not clarified that he was "aware" of the guilty plea in his role as factfinder, such references to the "mixed pleas"—whether by the Defense or the Government—could be objectionable references to matters not in evidence and not reasonably anticipated to be entered into evidence. Mr. DC trusted that the trial judge would not use this information "inappropriately," and there is no clear indication the trial judge did misuse it.[18]

Appellant bears the burden to demonstrate both deficient performance and prejudice. *Datavs*, 71 M.J. at 424. Although we perceive a reasonable argument that Mr. DC's action did not fall measurably below the expected standard, given the weak defense trial defense counsel offered in their declarations and at the *DuBay* hearing for their performance in this regard, we decline to decide whether that performance was constitutionally deficient. Instead, we hold Appellant has failed to demonstrate a reasonable probability of a more favorable result in the absence of any such deficiency, given the absence of evidence that the trial judge misused Appellant's guilty pleas. Accordingly, we are not persuaded Appellant is entitled to relief.

### b. Failing to Use Electronic Media to Impeach KC

With regard to Appellant's contention that the Defense did not make adequate use of the Appellant's digital extraction of his cell phone data to impeach KC, trial defense counsel collectively offered several explanations through their declarations and *DuBay* hearing testimony. First, as Appellant himself concedes, Mr. JC did draw upon information from one of the extractions during his cross-examination and elicited favorable testimony as a result. For example, KC conceded that she sent Appellant complimentary messages and "naked" images of herself even after Appellant had threatened and assaulted her in Australia in May 2017. Because KC admitted to sending positive messages to Appellant even after all of the charged offenses, trial defense counsel deemed it unnecessary to attempt to impeach her with specific messages from the extraction. In addition, trial defense counsel were concerned that if they directly used parts of the extraction at trial, they would have to disclose portions of the extraction to the Government. In Mr. DC's words, the extracted messages were overall "definitely a mixed bag;" as Mr. JC put it, for every message that "reflected poorly" on KC, as many messages or more reflected poorly on Appellant.

Accordingly, we find Appellant has failed to demonstrate trial defense counsel's performance was outside the "wide range of reasonable professional

---

[18] In contrast, as discussed *infra*, trial counsel *did* use this information inappropriately in the Government's closing argument.

assistance." *Datavs*, 71 M.J. at 424 (citation omitted). Mr. JC was able to elicit the essence of the favorable testimony contained in the extractions—that KC continued to send flattering and sexually charged messages to Appellant even after the alleged offenses occurred—without resorting to the messages themselves. Accordingly, trial defense counsel could reasonably conclude, as a matter of tactics, that attempting to use specific messages was unnecessary and entailed risks of disclosing additional information to the Government.

Additionally, assuming for purposes of analysis that the failure to make greater use of the extracted messages was deficient, we find Appellant has failed to demonstrate material prejudice. The sample messages attached to Appellant's declaration add little to the concessions KC made on cross-examination. Moreover, these messages are not inconsistent with KC's testimony that at the time the sexual assaults occurred, she essentially chose to act as if the assaults had not happened because she still hoped to build a family with Appellant. Therefore, it is unsurprising that she would not have sent Appellant text messages accusing him of sexual assault. Accordingly, we find no prospect of a reasonable probability that their introduction would have produced a more favorable result for Appellant.

### c. Failing to Use the 2015 LPCC Letter to Impeach KC

Appellant contends trial defense counsel were ineffective by failing to use the 9 December 2015 letter from the LPCC complaints officer to KC to impeach testimony in which she denied "being investigated" by the LPCC. The letter in question advised KC that the LPCC was "investigating [her] conduct" related to CC's unlawful access of restricted police information. Appellant cites the following colloquy from Mr. JC's cross-examination of KC at Appellant's November 2018 trial:

> Q. Are you currently still being investigated by the Legal Board for your actions regarding [CC], the detective who went to prison?
>
> A. I'm not being investigated. I've been asked to explain my conduct, as anyone would who had been going -- gone through something like this. And I am explaining my conduct, I'm defending -- because I didn't do anything wrong. There has been no file determination.

At the *DuBay* hearing, Mr. JC testified that to the best of his recollection the ethical inquiries regarding KC were "closed" as of the date of Appellant's trial. He recalled that there had been "some findings against [KC]" regarding her "maturity [and] some subject matter issues . . . but nothing that went to her credibility [as] a witness in that court-martial." Mr. JC further testified he believed he had seen a copy of the 9 December 2015 LPCC letter before trial.

When appellate defense counsel posited, "[a]t trial [KC] claimed that she had not been put under investigation by the CCC or the LPCC," and asked, "Why wouldn't you have used documentation to prove that she was lying before the Court about that very matter?" Mr. JC responded that he could not answer the question because he could not "remember the colloquy of trial." He further explained he did not "remember having made that error," but he was "not saying [he] didn't make it."

We are not persuaded Appellant has demonstrated deficient performance. Once again, it is important to examine the record rather than characterizations of the record. The portion of KC's testimony Appellant cites does not deny she was *ever* under investigation by the LPCC with regard to CC. Rather, KC testified that she was "not being investigated." As the *DuBay* judge subsequently found, as of the date of Appellant's trial in November 2018, KC's statement was literally true. The LPCC investigation had closed more than a year earlier, and the matter had been referred to the SAT for resolution by a separate administrative process.

Thus, "confronting" KC with the 9 December 2015 LPCC letter would not have exposed false testimony by KC. The most one might reasonably expect is that it would have led KC to have to clarify that there had been an investigation in the past and the matter was currently the subject of SAT proceedings, and the Defense could attempt to use that clarification to portray her original answer as, if not false, misleading. However, we are not persuaded the value of such evidence would have been more than negligible. Although KC denied she was currently being investigated, her answers acknowledged there was an ongoing inquiry of some sort in which she was "defending" her conduct. These acknowledgments blunt the suggestion that KC was attempting to materially mislead the trial judge.

Accordingly, we conclude Appellant has failed to meet his burden that Mr. JC's failure to use the LPCC letter to impeach KC's testimony constituted deficient performance. Furthermore, for similar reasons, assuming for purposes of analysis trial defense counsel's performance was deficient, Appellant has failed to demonstrate a reasonable probability of a more favorable result. As explained above, the record indicates confronting KC with the letter would not have exposed false testimony or materially affected the trial judge's assessment of KC's credibility.

## C. Voluntariness of Appellant's Guilty Plea

### 1. Additional Background

Appellant has provided a declaration to this court in which he asserts, *inter alia*, that he had intended to plead not guilty to all the charges and specifications, but that his trial civilian defense counsel compelled him to plead guilty

to the Article 128 and 134, UCMJ, offenses. Appellant acknowledges he "did not act appropriately with [KC] on numerous occasions," but that "many" of the recordings she made of the charged threats and assaults were created after KC provoked him or were otherwise "taken out of context." Appellant states he "also wanted to explore whether [his] mental health issues"—specifically post-traumatic stress disorder (PTSD) and Tourette's Syndrome—"affected [his] actions." Appellant states he did not know whether he would be convicted, but he at least wanted to plead not guilty, and he initially believed his trial defense counsel were "on the same page."

However, Appellant explains: "[A]bout four days prior to trial, Mr. [JC] tells me I had to plead guilty [to the assault and communicating a threat specifications involving KC]. He said he couldn't explain the recordings and if I didn't plead guilty, I would be imprisoned for life." Appellant states at that point he felt he had no choice but to follow Mr. JC's advice because he had already spent a great deal of money for his civilian attorneys, he did not believe he could get another continuance or find new civilian counsel at that point, and he did not want to proceed with his military counsel alone.

On Appellant's behalf, trial defense counsel entered unconditional guilty pleas to one specification of aggravated assault and two specifications of assault consummated by a battery in violation of Article 128, UCMJ, and two specifications of wrongfully communicating threats in violation of Article 134, UCMJ. There was no pretrial agreement or stipulation of fact. The military judge conducted an inquiry into the providence of Appellant's pleas to each specification, including having Appellant explain in his own words why Appellant believed he was guilty of each offense. Appellant told the military judge he had enough time to discuss the case with his trial defense counsel and that he was satisfied with their advice. He further stated he was pleading guilty voluntarily and no one had "made any threat or forced [Appellant] in any way to get [him] to plead guilty."

**2. Law**

We review a military judge's decision to accept an accused's guilty plea for an abuse of discretion. *United States v. Riley*, 72 M.J. 115, 119 (C.A.A.F. 2013) (citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). "An abuse of discretion occurs when there is 'something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea.'" *Id.* (quoting *Inabinette*, 66 M.J. at 322).

"The military judge must ensure there is a basis in law and fact to support the plea to the offense charged." *United States v. Soto*, 69 M.J. 304, 307 (C.A.A.F. 2011) (citing *Inabinette*, 66 M.J. at 321–22) (additional citation omitted). "A plea is provident so long as [the a]ppellant was 'convinced of, and [was]

able to describe, all of the facts necessary to establish [his] guilt.'" *United States v. Murphy*, 74 M.J. 302, 308 (C.A.A.F. 2015) (second and third alterations in original) (quoting *United States v. O'Connor*, 58 M.J. 450, 453 (C.A.A.F. 2003)). "This court must find 'a substantial conflict between the plea and the accused's statements or other evidence' in order to set aside a guilty plea. The 'mere possibility' of a conflict is not sufficient." *United States v. Watson*, 71 M.J. 54, 58 (C.A.A.F. 2012) (quoting *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996)).

### 3. Analysis

To the extent Appellant's assertions regarding the voluntariness of his guilty pleas impugn the performance of his trial defense counsel, we have considered them as part of our analysis above of Appellant's claims of ineffective assistance of counsel. However, we have separately assessed whether the trial judge abused his discretion in accepting the guilty pleas that Appellant now asserts were involuntary.

Appellant acknowledges he "went through the guilty plea inquiry and answered the judge's questions." He does not now assert the military judge's inquiry was deficient with respect to any of the elements of the various offenses or any potential defenses. Among other admissions, Appellant agreed that he was not acting in defense of himself or anyone else when he committed the assaults. He told the military judge his various threats to KC had no justification or excuse, and that a bystander who heard them would have believed he had intended to carry them out. Before the military judge, Appellant disavowed that his trial defense counsel or anyone else had compelled him to plead guilty against his will. Appellant has not identified any substantial conflict between his pleas of guilty and his statements to the military judge or any other evidence presented at his court-martial. Accordingly, we find the trial judge did not abuse his discretion by accepting Appellant's pleas of guilty.

## D. Petition for New Trial

### 1. Additional Background

At trial, Mr. JC cross-examined KC regarding her practice of law in Australia. Mr. JC elicited that as of 2015, two complaints made by former clients against KC were "being investigated" and were "still unresolved." The following colloquy ensued:

> Q. -- you had reason to become somewhat infamous in the legal community before meeting [Appellant]. Is that correct?
>
> A. I wouldn't say that.
>
> Q. Okay. There was a potential criminal proceeding against you.

A. There was never a criminal proceeding against me.

Q. The question was, potential. You were being investigated?

A. There was never a criminal investigation against me.

Q. Okay. Ma'am, did a detective, [CC], go to prison for handing you -- giving you some sort of confidential documents that he wasn't supposed to give you?

A. Yes.

Q. Okay. Were you in the newspapers on a regular basis based upon [CC] having given you some documents in Perth?

A. No.

Q. Were you in the newspapers for this issue?

A. I was on what -- maybe once or twice.

Q. Did the Australian authorities consider for some time whether or not you should be indicted along with [CC]?

A. No. I was never criminally investigated. Never.

Q. Are you currently still being investigated by the Legal Board for your actions regarding [CC], the detective who went to prison?

A. I'm not being investigated. I've been asked to explain my conduct, as anyone would who had been going -- gone through something like this. And I am explaining my conduct, I'm defending -- because I didn't do anything wrong. There has been no file determination.

. . . .

A. If I had done something wrong I would have been charged. And that's what my husband [JH] said to the media, and that's what Triple C said. If I had done something wrong, they would have charged me.

. . . .

Q. You had professional problems in Australia?

A. I didn't have professional problems. I was clearly --

Q. -- Your reputation in Australia as a lawyer was damaged both by your marriage to [JH] and your interactions with [CC]. Isn't that true?

A. That's incorrect.

Mr. JC then moved on to other topics.

Appellant's petition for a new trial asserts KC lied in her testimony quoted above in several respects, including: (1) denying that she was being investigated by the legal board for her conduct with CC or was having "professional problems;" (2) denying that she had been criminally investigated for her conduct with CC; and (3) denying that she had done "anything wrong." Appellant attached three documents to his petition which, he asserts, demonstrate KC committed fraud upon the court-martial.

The first attached document is a record of a May 2019 order from the State Administrative Tribunal (SAT) addressing the matters referred by the LPCC against KC. The order stated that the LPCC and KC had in "February 2019 agreed the terms upon which the proceedings could be settled," and had agreed to certain "facts." The SAT found KC engaged in professional misconduct in her actions with CC by recklessly accepting restricted material from a police computer system, by disclosing privileged or confidential information to CC, and by failing to immediately return to the police certain material she received from CC. The SAT also found KC committed professional misconduct in her representation of the two former clients who had made complaints against her. The order further stated KC was not to be granted a local practicing certificate before 30 June 2019, in accordance with an "in principle" agreement the LPCC and KC reached in early September 2018, the signing of which was delayed until February 2019 by "unrelated external factors affecting the practitioner [KC]." The SAT order permitted KC to obtain a practice certificate on or after 30 June 2019 provided she met certain conditions, including *inter alia* remedial training and practicing under the supervision of an experienced attorney for a period of time.

The second attached document is an excerpt of an LPCC report, which included a summary of the findings the SAT made with respect to KC, who is identified by name, and the penalties imposed. The substance of the report information specific to KC is from the May 2019 SAT order, as described above.

The third attached document is a printed version of an online article from a Western Australia publication about KC's involvement with CC and dated July 2014. The article states the CCC "defended its decision not to charge" KC, "saying there was insufficient evidence to pursue a case against her."

After receiving the petition and a response brief from the Government, this court ordered a *DuBay* hearing, cited *supra*. The order specified 11 questions to be answered by the *DuBay* judge, primarily related to the claims Appellant set forth in his petition for a new trial, along with some matters related to Appellant's claims of ineffective assistance of counsel as described above. After some delay, the *DuBay* judge conducted a hearing at which she received

documentary evidence from the parties and heard testimony from all three of Appellant's trial defense counsel and from KC. In pertinent part, KC testified that her trial testimony was not inaccurate. She explained that although she provided evidence during the investigation of CC, she was not the subject of the CCC's investigation because that organization investigated public figures such as police officers, not private attorneys. KC also testified that at the time of her trial testimony in November 2018, she was not being investigated by the LPCC because its investigation had already concluded prior to the referral to the SAT. She further explained that at the time of her trial testimony she believed she had done nothing wrong with respect to CC, and she continued to believe that was true. KC testified she felt compelled to agree to the facts recited in the May 2019 SAT order on the advice of her attorney in order to preserve her ability to practice law, notwithstanding her prior firm intention to contest the allegations. KC explained that the SAT order's reference to an agreement "in principle" in September 2018 referred to KC's agreement not to seek a new local practicing certificate before 30 June 2019, pending the outcome of the SAT proceedings, rather than any agreement in September 2018 that she had committed professional misconduct.

During the *DuBay* hearing, trial defense counsel were asked whether they were aware of the July 2014 online article attached to the petition for a new trial. Mr. DC testified he had seen it before Appellant's trial. Mr. JC testified he could not remember if he had seen it before the trial. Capt CB testified that during his trial preparation he had seen at least one online article about KC and "what had happened in Western Australia," but he did not specify whether it was the same article attached to the petition.

After the hearing, the *DuBay* judge issued her findings of fact and conclusions of law. Notably, the *DuBay* judge's findings included the following:

> KC testified credibly, albeit nonresponsive at times.
>
> . . . .
>
> Prior to trial, trial defense counsel was [sic] aware of news articles related to [ ] CC and KC (either attachment 3 [to the petition] or something similar to attachment 3) . . . .
>
> . . . .
>
> [ ] KC did not reach an in principle agreement to settle professional misconduct proceedings with the [LPCC] prior to Appellant's trial. . . . [T]he [LPCC] had not yet provided an assertion of facts upon which she could agree or dispute.

> KC reached an in principle agreement not to seek renewal of her local practicing certificate before 30 June 2019 with the Legal Practice Board. . . .

> [ ] Yes, KC testified truthfully, in that she believed she had done nothing wrong in matters pertaining to [CC]. . . . Her testimony was consistent with her position in the ongoing mediation with the [LPCC] at that time.

> . . . .

> [ ] Yes, KC was truthful when she answered "no, I was never criminally investigated. Never." . . .

>  . . . .

> [ ] Yes, KC's testimony was truthful when she answered "I'm not being investigated[."] The [LPCC] had ceased its investigation into KC, pertaining to [ ] CC, before Appellant's trial.

> [ ] No, KC did not commit perjury in her testimony or otherwise commit fraud up-on [sic] the court-martial. KC's testimony was unresponsive but literally true.

### 2. Law

A petitioner may petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Article 73, UCMJ, 10 U.S.C. § 873. A petition for a new trial does not proceed through the usual appellate process. *See id.*; *United States v. Brooks*, 49 M.J. 64, 68 (C.A.A.F. 1998). Instead, it is submitted to The Judge Advocate General, who acts on the petition unless the case is pending before an appellate court, in which case he refers the petition to the appellate court where the case is pending. R.C.M. 1210(a), (e).

> A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

> (A) The evidence was discovered after the trial;

> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2).

"No fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged."

28

R.C.M. 1210(f)(3). Examples of fraud on a court-martial that may warrant granting a new trial include, *inter alia*, "confessed or proved perjury in testimony . . . which clearly had a substantial contributing effect on a finding of guilty and without which there probably would not have been a finding of guilty." R.C.M. 1210(f)(3), Discussion.

A military judge's findings of fact at a *DuBay* hearing are reviewed for clear error. *United States v. Wean*, 45 M.J. 461, 463 (C.A.A.F. 1997) (citations omitted). A military judge's "finding of fact is clearly erroneous when there is no evidence to support the finding . . . or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018) (quoting *United States v. Martin*, 56 M.J. 97, 106 (C.A.A.F. 2001)) (additional citation omitted). A military judge's "[c]redibility determinations are 'entitled to great deference on appeal and will not be reversed absent a clear abuse of discretion.'" *United States v. Hernandez*, 81 M.J. 432, 442 (C.A.A.F. 2021) (quoting *United States v. Reynolds*, 23 M.J. 292, 294 (C.M.A. 1987)) (additional citation omitted). An abuse of discretion occurs when a military judge's decision is based on clearly erroneous findings of fact or incorrect conclusions of law. *Id.* at 437 (citing *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017)).

"[R]equests for a new trial . . . are generally disfavored, and are granted only if a manifest injustice would result absent a new trial . . . ." *United States v. Hull*, 70 M.J. 145, 152 (C.A.A.F. 2011) (quoting *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993)).

**3. Analysis**

The *DuBay* judge's findings of fact[19]—unless clearly erroneous—would lead us to the conclusion that Appellant is not entitled to a new trial on the basis of fraud on the court. The *DuBay* judge found KC testified credibly at the hearing when she asserted she testified truthfully at Appellant's trial and explained her trial testimony. The *DuBay* judge specifically found KC testified truthfully when she asserted she had done nothing wrong in relation to CC, in that she believed what she was saying. The *DuBay* judge also specifically found KC testified truthfully that KC herself had not been criminally investigated, in that there was no evidence KC was the focus of the CCC or any other organization conducting a criminal investigation; and that KC testified truthfully she was not being "investigated" as of the time of Appellant's trial, because at that point

---

[19] For purposes of our analysis, we consider the military judge's determination as to whether a witness testified truthfully to be a finding of fact, whereas whether a witness committed perjury or fraud is a conclusion of law.

the LPCC had already concluded its investigation into KC's professional behavior and referred the matter to the SAT. It is likely that had trial defense counsel phrased his cross-examination questions differently, or asked different or additional questions, the Defense could have elicited different or additional answers from KC. However, as the *DuBay* judge put it, KC's testimony in response to the questions asked was "unresponsive" at times, "but literally true."

The *DuBay* proceedings also undermine newly discovered evidence as a basis for a new trial. The *DuBay* judge found trial defense counsel were aware before trial of the July 2014 article attached to the petition for a new trial, or aware of an article substantially similar to it, and the record clearly supports this finding. Therefore, the information therein was neither discovered only after trial, nor undiscoverable by trial defense counsel before trial in the exercise of due diligence. In contrast, the May 2019 SAT order and the LPCC report were new evidence, and not previously discoverable, in that they did not exist at the time of Appellant's trial. However, although this information regarding the resolution of the professional complaints against KC raised questions which led to the *DuBay* hearing, in light of the *DuBay* proceedings this information would not have led to a substantially more favorable result for Appellant at trial. As found by the *DuBay* judge, these documents did not reveal any perjury or other fraud on the court by KC, who continued to believe in the truth of her answers. The SAT order and LPCC report essentially documented future events that had not come to pass as of the time of Appellant's trial—that is, the negotiated resolution of the SAT proceedings. Thus, trial defense counsel could not have used these nonexistent future developments at trial in November 2018. Assuming *arguendo* trial defense counsel could have questioned KC about these developments, we are not persuaded that a new trial is warranted. The adverse information about KC's performance as a relatively junior attorney in Australia did not evidently rise to the level of criminal behavior. It did not, moreover, bar KC's continued practice as an attorney after additional training and a period of supervision. At the same time, such conduct only peripherally related—at best—to the offenses charged against Appellant, it was not such compelling material that it would have "probably produce[d] a substantially more favorable result," and its absence from trial did not result in "manifest injustice" to Appellant. R.C.M. 1210(f)(2); *Hull*, 70 M.J. at 152 (citation omitted).

Appellant attacks the *DuBay* judge's findings and conclusions in several respects. We address his most significant arguments below.

Appellant contends the record indicates KC lied about the LPCC investigation in multiple ways during her testimony. First, Appellant cites from a different portion of KC's cross-examination than the one cited above to contend

KC did lie to the effect that she had not been "investigated." The relevant colloquy between trial defense counsel and KC is set forth below:

Q. By 2015 how many people had made complaints that were being investigated about you?

A. By 2015?

Q. Correct.

A. I had two.

Q. Now aside from --

A. -- But it's --

Q. -- your marital difficulties and the legal investigations, in regards to your law license --

A. -- They weren't -- excuse me, sir, they are not in regards to my law license, there were complaints made by someone who was aggrieved --

Q. -- That were being an [sic] investigated.

A. It's not investigated. It is I'm given the opportunity to respond. They may not go for --

Q. -- So, those were still unresolved in 2015, correct? Because there are still a couple of them that are unresolved now, right?

A. Yes.

Q. Okay. I just -- we'll move on from that.

We find Appellant's argument on this point uncompelling. Although KC may have contested the term "investigated," her testimony was not substantially misleading. She agreed that two of her former clients had made complaints against her, which she had been asked to respond to, and which remained unresolved as of the time of Appellant's trial. So far as the record discloses, this information was substantially accurate. Moreover, a fair interpretation of trial defense counsel's question is that KC was asked whether the complaints had been investigated *as of 2015*, and that KC responded that *as of 2015* she had been asked to respond to the complaints, but the matter had not been formally "investigated."[20]

---

[20] For similar reasons, we are not persuaded by Appellant's argument that KC lied when she testified the "investigations" were "not in regards to [her] law license." A fair interpretation of the record indicates KC meant that as of 2015, there was no

*(Footnote continues on next page)*

Appellant contends KC lied when she testified that she did not have professional problems and that her "reputation in Australia as a lawyer" had not been "damaged both by [her] marriage to [JH] and [her] interactions with [CC]." However, the terms "problems" and "reputation" both lack clear definition in this context and are open to subjective interpretation. Moreover, as of the time of Appellant's trial, KC had not received any adverse determination from the SAT. Moreover, the record does not indicate the complaints by two of KC's former clients were widely known *at that point* such that they caused KC any "professional problems." With respect to how KC's interactions with CC had affected her reputation as a lawyer, other than the online article from more than four years earlier reporting that KC would not be prosecuted, the record does not indicate what KC's reputation as a lawyer was as of November 2018. We might expect the subsequent findings in May 2019 that KC had engaged in professional misconduct, as reflected in the SAT order and LPCC report, resulting in certain penalties, represented a "professional problem" and negatively affected her reputation as a lawyer to some extent. However, as of the time KC testified at Appellant's trial, those findings and penalties had not come to pass.

Appellant contends the *DuBay* judge's general finding of fact that "KC testified credibly" was clearly erroneous. However, we find nothing in the record to overcome the "great deference" to which this finding is entitled. *Hernandez*, 81 M.J. at 442 (citation omitted). For example, we are not persuaded the record indicates any admitted or clear contradictions in KC's testimony. KC's answers were at times unclear or confusing due in part to the wording or focus of particular questions she was asked, to the distinctions she often sought to make in her answers, and to the unresponsive nature of some of her testimony. However, these are not necessarily hallmarks of non-credible testimony.

Appellant contends the negotiated agreement between KC and the LPCC reflected in the May 2019 SAT order contradicts significant portions of KC's testimony. We agree that, on the surface, the concessions KC apparently made after Appellant's trial reflected in the order are at odds with some of her testimony. However, the *DuBay* judge could reasonably credit KC's testimony that as of November 2018 she intended to contest these matters, and that she only later agreed to a negotiated settlement on the advice of her counsel—contrary to her actual beliefs—in order to secure a relatively favorable resolution and preserve her ability to practice law. Whatever an observer might think of KC's willingness to purport to agree to findings contrary to her actual beliefs, the *DuBay* judge could reasonably conclude that decision does not demonstrate her

---

investigation per se regarding the former clients' complaints, much less an investigation regarding her law license.

prior trial testimony was fraudulent. Even if we accept for purposes of argument that in 2019 KC came to believe that her actions were at least in part improper, that does not establish that she lied at Appellant's trial in November 2018.

Appellant contends the *DuBay* judge applied an overly restrictive definition of "fraud," and essentially focused only on whether KC had committed perjury. Appellant suggests that by focusing on whether KC's testimony was "literally true," the *DuBay* judge overlooked whether KC intentionally misled the court-martial without lying. We accept the proposition that "fraud" includes other methods besides perjury by which a witness may intentionally deceive the court; for instance, the Discussion to R.C.M. 1210(f)(3) provides the additional example of "forgery of documentary evidence which clearly had a substantial contributing effect on a finding of guilty." However, we are not persuaded this observation impugns the *DuBay* judge's findings and conclusions from the hearing. Although KC often, and at times unresponsively, resisted trial defense counsel's attempts to characterize events or circumstances in particular ways, and arguably drew certain fine distinctions in her testimony, we are not persuaded Appellant has demonstrated KC intentionally misled the court-martial or that the *DuBay* judge's finding of no perjury or other fraud was clearly incorrect.

For the foregoing reasons, we conclude Appellant has failed to demonstrate he is entitled to a new trial on the basis of either fraud on the court or newly discovered evidence.

### E. Trial Counsel's Closing Argument

#### 1. Additional Background

Prior to inquiring into the providence of Appellant's guilty pleas to the Article 128 and 134, UCMJ, offenses, the trial judge advised Appellant that by pleading guilty Appellant would give up "three important rights[,] [b]ut . . . only with respect to those offenses to which [he] pled guilty. [He] still ha[s] the rights with respect to the other offenses. . . . First, [he] g[a]ve up the right against self-incrimination; that is, the right to say nothing at all." Appellant acknowledged that he understood.

As described above in relation to Appellant's assertions of ineffective assistance of counsel, during the Defense's opening statement regarding the litigated Article 120, UCMJ, specifications, Mr. DC referred to Appellant's guilty pleas and providence inquiry. At the conclusion of the opening statement, the trial judge asked Mr. DC whether the trial judge as trier-of-fact was "operating in a world where [he was] aware of the previous guilty plea." Mr. DC agreed that for purposes of fact-finding, the trial judge would be "aware of it."

Trial counsel's closing argument included the following comments:

The defense counsel asked you to operate in this world where you know that he pled guilty to a number of offenses. So right now, I want to talk about how that goes towards the victim's credibility, because as you're standing here operating in this world where he has admitted to crimes against [KC], the [G]overnment believes you can use that in assessing her credibility on the stand. Whether or not she's telling the truth for the [Article] 120[, UCMJ,] offenses.

So you know that she's telling the truth when she says the accused threatened her. You know that, Your Honor. Undeniable. You know that she's telling the truth about her being choked by the accused. Undeniable. You know that she's telling the truth about her being threatened with a screwdriver. That is undeniable. You know she's telling the truth about being hit in the back of the head by the accused. You can't deny it. You know that even after she sat right where she's sitting right now, and heard the accused plead guilty, she still continued to testify -- but she could have left.

She could have went back to Australia. She could have returned to see her son who she is away from for the first time in her life. . . . She could have threw her arms up and said, "You know what? He pled guilty. I'm a lawyer. I know what that means. He's has [sic] a conviction, I'm getting out of town," but she didn't. She still came and testified. . . .

. . . .

Your Honor, it's the [G]overnment's position that you really have to find her to be an evil person if you think she's going to come here and testify and lie about someone raping [sic][21] her. I mean, because that's what an evil person does. That she had such motivation to lie about being raped [sic], but not lie about the other charges that the accused has pled guilty to. And so, when [D]efense is asking you or pushing forth this theory that she's a liar. They're really saying she's a partial liar -- that she's lied about some things, but not lied about others. And that makes it even more difficult for you when you're looking at her

---

[21] Appellant was charged with sexual assault against KC, not rape.

saying, "Okay. You're a liar. Well, did you lie about this, but why would you lie about that?"[22]

Trial defense counsel did not object to these comments.

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). Under plain error review, the appellant bears the burden to demonstrate error that is clear or obvious and results in material prejudice to his substantial rights. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted). "[W]here a forfeited constitutional error was clear or obvious, 'material prejudice' is assessed using the 'harmless beyond a reasonable doubt' standard . . . ." *United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019) (citations omitted). "That standard is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction." *Id.* (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example] a constitutional provision, a statute, a *Manual* rule, or an applicable professional ethics canon." *Andrews*, 77 M.J. at 402 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). "[T]rial counsel may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted).

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. "In a guilty plea context, a

---

[22] Trial counsel supplemented his argument with 23 slides. One of these slides listed factors that trial counsel contended enhanced KC's credibility, including *inter alia* that KC was "telling the truth" in her AFOSI interview about "threats," "being choked," "being threatened with a screwdriver," and being "hit in the back of the head." Another slide simply stated "[KC] is Evil."

military judge who has advised an accused that she is waiving her right against self-incrimination only to those offenses to which she is pleading guilty cannot later rely on those statements as proof of a separate offense." *Flores*, 69 M.J. at 368 (C.A.A.F. 2011). Neither the guilty plea itself nor any related statements as to one offense may be "admitted to prove any element of a separate offense." *Id.* at 369. "To do so would compel an accused to incriminate herself in the separate criminal proceeding." *Id.* at 370.

We assess prejudice by considering whether the trial counsel's comments were so damaging that we cannot be confident the appellant was convicted on the basis of the evidence alone. *See Halpin*, 71 M.J. at 480; *Fletcher*, 62 M.J. at 184. In assessing prejudice from improper argument, we balance three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction or sentence, as applicable. *See Halpin*, 71 M.J. at 480; *Fletcher*, 62 M.J. at 184. "[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

### 3. Analysis

Appellant essentially contends the portion of trial counsel's closing argument quoted above was improper in two respects: (1) it "request[ed] that the military judge improperly use [Appellant's] prior guilty pleas to find him guilty of the sexual assault charges;" and (2) "the Government argued the *only* way for the military judge to acquit [Appellant] would be if the military judge made an affirmative finding that [KC] was an 'evil person.'"[23] We consider each contention in turn. Because trial defense counsel did not object, we review for plain error.

#### a. References to Appellant's Guilty Pleas

We agree with Appellant that trial counsel committed a clear error when he used Appellant's guilty pleas and providence inquiry to bolster his argument that Appellant was guilty of the contested sexual offenses. Trial counsel relied on the Defense's agreement that the trial participants were "operating in a world" where the trial judge was "aware" of the guilty pleas. However, the Defense's agreement that the military judge was aware of the guilty pleas was not an agreement that the Government could use Appellant's guilty pleas and his sworn statements during the providence inquiry as evidence of his guilt. *Cf. Benchbook*, ¶ 2-5-4 (noting that in a mixed plea case before members, the

---

[23] Appellant also contends trial counsel's argument improperly shifted the burden of proof, but we find this aspect of his argument does not require distinct analysis. *See Matias*, 25 M.J. at 361.

accused has the option to request the members be informed of the guilty pleas). Using Appellant's guilty plea inquiry in this way would have, in effect, compelled Appellant to incriminate himself in the trial in a manner contrary to the military judge's explanations to Appellant and to the protections of the Fifth Amendment, and for which purpose Appellant never explicitly agreed. *See Flores*, 69 M.J. at 368–70.

However, we find Appellant is not entitled to relief in this military judge-alone trial. Due to the constitutional dimensions of trial counsel's error, we test for harmlessness beyond a reasonable doubt. *Tovarchavez*, 78 M.J. at 460. Considering that Appellant was tried by a military judge, and considering the record as a whole, we conclude this standard of harmlessness has been met. A military judge is "presumed to know the law and to follow it absent clear evidence to the contrary," and to "distinguish between proper and improper" arguments. *Erickson*, 65 M.J. at 225 (citation omitted). This presumption holds even where the military judge does not specifically note the argument is improper or state that he will not consider it. *Id.* On this record, we find no clear evidence the trial judge might have improperly considered trial counsel's argument. As indicated above, we find the military judge's clarification that as the trier-of-fact he was "aware" of the guilty pleas—echoing the procedure set forth in the *Benchbook* for a members trial in a mixed-pleas case—is no indication that he intended to apply Appellant's guilty plea inquiry to his deliberations on findings. Moreover, in general Appellant's court-martial was a well-tried case by the military judge, and we have identified no material errors on his part, much less any that would specifically call into question his understanding of the Fifth Amendment and proper use of Appellant's guilty pleas, as the CAAF explained over a decade ago in *Flores*. We further note the trial judge's mixed findings on the contested sexual assault offenses suggest that, rather than being persuaded by Appellant's wholesale arguments, the trial judge carefully parsed the evidence for each offense. Moreover, the absence of an objection is some evidence the Defense did not perceive a significant error.

We have considered the three *Fletcher* factors, and although they do not overwhelmingly favor the Government, because the law presumes trial counsel's improper argument did not influence the trial judge's verdict, we are nevertheless satisfied the error was harmless beyond a reasonable doubt.[24]

---

[24] The Government contends, *inter alia*, trial defense counsel invited trial counsel's argument by referring to Appellant's guilty pleas and providence inquiry in its opening statement. *See United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996) (citation omitted) ("Invited error does not provide a basis for relief."). We are not persuaded but, in light of our conclusion the error was harmless beyond a reasonable doubt, we decline to specifically address the Government's argument.

### *b. Comments as to Whether KC would have to be "Evil"*

We find trial counsel's comment that the trial judge would "have to find [KC] to be an evil person" to conclude that she lied in her testimony that she was "raped" was not plain or obvious error. Trial counsel was commenting on the evidence—specifically KC's testimony—and arguably reasonable inferences therefrom. Trial counsel did not argue the military judge would have to find KC was "evil" in order to acquit Appellant of sexual assault. Rather, trial counsel specifically associated the "evil" with the notion that KC had "lied" under oath about the alleged sexual assaults. If the military judge believed KC had lied, that is, knowingly falsely testified that Appellant sexually assaulted her, that would be an illegal act on her part and at least arguably an "evil" one. Certainly, our conclusion that trial counsel's comment was not plainly or obviously erroneous is not an indorsement; whether his argument was wise or effective is a separate question.

Assuming for purposes of argument that trial counsel's comment was plainly erroneous, we further conclude Appellant was not prejudiced. Although the evidence in favor of conviction was not overwhelming, it was an isolated comment in a lengthy closing argument, and the Defense's failure to object suggests its lack of significance. Most significantly, Appellant was tried by a military judge who is presumed to know the law and disregard improper arguments absent clear evidence to the contrary. *Erickson*, 65 M.J. at 225 (citation omitted). Similar to our analysis above, we find nothing in the record to suggest the military judge would have improperly considered trial counsel's "evil" comment. Accordingly, we are confident Appellant was convicted on the basis of the evidence alone. *See Fletcher*, 62 M.J. at 184

## F. Sentence Severity

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Our sentence appropriateness review includes "considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). Although we have "broad

discretionary power to review sentence appropriateness," *United States v. Kelly*, 77 M.J. 404, 405 (C.A.A.F. 2018), we have no authority to grant mercy, *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

Courts of Criminal Appeals (CCAs) are "not required . . . to engage in sentence comparison with specific [other] cases 'except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). Cases are "closely related" when, for example, they involve "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.* "[A]n appellant bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.' If the appellant meets that burden . . . then the Government must show that there is a rational basis for the disparity." *Id.*

A CCA may compare an appellant's case to other non-"closely related" cases in order to assess the propriety of the sentence, although it is not required to do so. *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001). However, unless the cases are closely related, "[t]he appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *Ballard*, 20 M.J. at 283).

**2. Analysis**

Appellant contends his sentence to confinement for 21 years in inappropriately severe in light of "numerous mitigating factors," and that this court should "provide him sentence relief of at least 15 years." In addition, Appellant personally asserts this court should compare his sentence to the sentences in 11 other cases involving sexual assault as reflected in unpublished opinions this court issued between 2002 and 2017.

With respect to comparing Appellant's sentence with those in other specific cases, Appellant has not attempted to demonstrate any of those cases have a "direct nexus" or are in any other way closely related to his own. *See Lacy*, 50 M.J. at 288. We find, moreover, Appellant has not demonstrated that an exception to the general rule against directly comparing sentences in non-closely related cases should apply here. *See LeBlanc*, 74 M.J. at 659. Accordingly, we decline to engage in such comparisons.

Turning to the evidence and unsworn statements in the instant case, Appellant asserts several mitigating circumstances. He points to his "unblemished" 19-year record of duty performance and absence of prior criminal

history. He emphasizes tragedies in his personal life that have negatively affected his mental health. Appellant also cites other mental health concerns including PTSD, flashbacks, and Tourette's Syndrome. Appellant also cites the "Forensic Psychological Evaluation Risk Assessment" report created by Dr. JF, the Defense's clinical and forensic psychologist, which was admitted as a defense exhibit; according to the report, Appellant "presents as a low-risk offender relevant to sexual violence."

Although we acknowledge the arguably mitigating circumstances Appellant cites, we are not persuaded his sentence to 21 years in confinement is inappropriately severe. Appellant sexually assaulted KC twice while she was pregnant, disregarding her crying and pleading for him to stop. He threatened her with physical violence many times, including threats to kill her or disfigure her face. These threats were made more credible and disturbing by Appellant's repeated physical violence toward KC, including strangling her on two separate occasions, striking her on the head, and putting the point of a screwdriver to her neck. Appellant does not contend, and the record does not indicate, that he was in any way not responsible for his crimes against KC. Appellant faced a maximum potential term of 70 years in confinement, in addition to reduction in rank, total forfeitures, and the mandatory dishonorable discharge. The mitigating circumstances Appellant cites were all presented to the military judge, who we may presume took them into account in arriving at the adjudged sentence. Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we conclude Appellant's sentence, although severe, is not inappropriately so.

## G. Post-Trial and Appellate Delay

### 1. Additional Background

Appellant was sentenced on 29 November 2018. After Appellant's trial, the court reporter prioritized transcribing two other courts-martial that had taken place before Appellant's. In January 2019, the court reporter requested transcription assistance, and she received a total of five days of such assistance from two other court reporters. The original court reporter did not begin transcribing the proceedings of Appellant's trial herself until 25 February 2019. She forwarded the transcripts to the arraignment judge and trial judge on 14 April 2019, and the base legal office received the record of trial authentications from both military judges on 19 April 2019. Appellant's area defense counsel[25]

---

[25] Instead of Capt CB, a different military defense counsel was assigned to assist Appellant with post-trial matters due to Appellant's claims that his trial defense team had been ineffective.

received the staff judge advocate recommendation on 29 April 2019 and Appellant received it on 1 May 2019. Appellant's area defense counsel submitted clemency matters to the convening authority on 29 May 2019 after he obtained an extension of time in which to file. The convening authority took action on 31 May 2019, 183 days after Appellant was sentenced.

The record of trial was docketed with this court 19 days later, on 19 June 2019. Appellant submitted his original assignments of error to this court on 6 June 2020 after obtaining ten enlargements of time. With the court's permission, Appellant submitted a supplement to his assignments of error on 15 July 2020 and did not submit his declaration in support of his assignments of error until 20 July 2020. On 27 July 2020, the Government moved to compel declarations from trial defense counsel responsive to Appellant's ineffective assistance of counsel claims; this court granted the motion on 6 August 2020. The Government timely submitted its original answer brief on 17 September 2020. Appellant filed his reply brief with this court on 8 October 2020 after requesting and being granted additional enlargements of time.

On 26 April 2021, while Appellant's case was pending review at this court, Appellant submitted the petition for a new trial on the basis of fraud on the court-martial and newly discovered evidence, as analyzed above. On 14 June 2021, this court returned the record of trial to The Judge Advocate General for the *DuBay* hearing. After two delays, related in part to the question of whether KC would be required to travel to the United States for the hearing during the COVID-19 pandemic,[26] the *DuBay* hearing ultimately took place on 5 and 6 April 2022. The *DuBay* judge entered her written findings of fact and conclusions of law on 12 April 2022, the court reporter certified the transcript on 3 June 2022, and the record was re-docketed with this court on 8 July 2022.

Appellant submitted his post-*DuBay* hearing assignments of error on 30 August 2022. On 28 September 2022, Appellant moved for leave to file a supplemental assignment of error and to attach a declaration from Appellant in support of the supplemental assignment of error; over the Government's opposition, this court granted these motions on 5 and 6 October 2022. The Government submitted its answer to Appellant's post-*DuBay* brief on 11 October 2022, and its answer to Appellant's supplemental assignment of error on 14 October 2022.

**2. Law**

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129,

---

[26] *See In re KC*, Misc. Dkt. No. 2021-06, 2021 CCA LEXIS 593 (A.F. Ct. Crim. App. 9 Nov. 2021) (order).

135 (C.A.A.F. 2006) (citations omitted). We review de novo an appellant's entitlement to relief for post-trial delay. *Id.* at 135 (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action on the sentence within 120 days of sentencing, when the record of trial is not docketed with the CCA within 30 days of action, or when the CCA has not rendered a decision within 18 months of docketing. *Id.* at 142; *cf. United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (applying *Moreno* in the context of new post-trial procedures applicable to cases referred to trial on or after 1 January 2019).

Where there is such a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). "No single [*Barker*] factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Under Article 66(c), UCMJ, 10 U.S.C. § 866(c), a CCA may grant relief for unreasonable post-trial or appellate delay as a matter of sentence appropriateness review, even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002); *see also United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016) (enumerating factors to guide CCA analysis as to whether *Tardif* relief is appropriate).

### 3. Analysis

Appellant contends he is entitled to relief for two periods of unreasonable post-trial delay: the 183 days that elapsed between sentencing and convening

authority action, and delays in appellate review related to the *DuBay* hearing.[27] We consider each in turn.

### a. Delay between Sentencing and Action

Appellant notes the 183 days that elapsed between sentencing and action exceeded the *Moreno* standard of 120 days, and therefore constitutes a facially unreasonable delay. In particular, Appellant contends the 109 days taken to produce a transcript that amounted to 574 pages was "far too long." Although Appellant does not assert he was prejudiced by the delay and does not claim a due process violation, he attributes the delay to "either gross indifference or institutional neglect" and requests this court reduce his sentence to confinement by 183 days pursuant to *Tardif*.

The Government concedes the delay is facially unreasonable, but contends Appellant is not entitled to relief under either *Moreno* or *Tardif*. We agree.

Because Appellant has not attempted to demonstrate he was prejudiced by this delay, and we perceive no such cognizable prejudice, no due process violation exists unless the delay was so egregious as to undermine the public perception of the fairness and integrity of the military justice system. *Toohey*, 63 M.J. at 362. We agree with the parties that the delay was largely attributable to transcribing the record. Although the transcript was not particularly long, the delay was primarily caused by the court reporter's workload, specifically that she prioritized the transcription of two other courts-martial that had been tried before Appellant's. Although the transcription of Appellant's record might have been accomplished more quickly, the court reporter made some effort to speed the process by requesting transcription assistance, and we do not find prioritizing workload on a first-in, first-out basis under the circumstances presented here undermines confidence in the military justice system.

We have also considered the factors enumerated in *Gay* and decline to grant sentence appropriateness relief under *Tardif*. Although the delay substantially exceeded the 120-day *Moreno* standard, we find no bad faith or gross indifference on the Government's part, and the remaining factors on balance also weigh against granting relief.

### b. Delay Associated with DuBay *Hearing*

Appellant asserts the Government incurred several unreasonable delays related to the *DuBay* proceedings, including *inter alia*: the elapse of 25 days between this court's order directing a hearing and the convening authority requesting a hearing at Fort Leavenworth; the elapse of 99 days between the

---

[27] Appellant personally asserts the second of these contentions pursuant to *Grostefon*, 12 M.J. at 431.

military judge[28] scheduling a 19 January 2022 hearing date on 1 September 2021 and the Government's 9 December 2021 request for special consideration from the Australian government for KC to travel during the COVID-19 pandemic; and the elapse of 39 days between re-docketing of the record with this court and Appellant being served his copy of the post-*DuBay* hearing record of trial, which he asserts was necessary in order to file his post-*DuBay* hearing assignments of error. In terms of the *Moreno* standards for facially unreasonable delay, Appellant asserts the approximately 43 months that have elapsed since his case was originally docketed with this court far exceeds the 18-month *Moreno* standard, "[d]ue in no small part to the Government's dilatory actions." In addition, Appellant analogizes the 132-day period between the conclusion of the *DuBay* hearing on 6 April 2022 and his delayed receipt of the record on 16 August 2022 with the 120-day *Moreno* standard for sentencing to convening authority action. Appellant contends these delays violated his due process right to timely appellate review and, in the alternative, warrant sentence appropriateness relief under *Tardif*.

We find Appellant has failed to demonstrate he is entitled to relief. Appellant asserts he experienced qualifying prejudice from the delay in that "he has suffered more than the average appellant awaiting appellate review, in that he has had to live with the fact that he remains confined due to an unjust conviction." However, we have found neither Appellant's convictions nor his sentence to be "unjust." Moreover, we do not perceive the delays cited created any identifiable prejudice at the *DuBay* hearing itself or other cognizable prejudice under *Moreno*.

In the absence of prejudice, no due process violation exists unless Appellant demonstrates delays so egregious as to undermine the perception of fairness and integrity in the military justice system. Appellant has failed to do so. We acknowledge there have been extensive delays in the appellate review of Appellant's court-martial. These delays are largely attributable to the *DuBay* proceedings this court ordered for the purpose of developing evidence regarding matters Appellant raised in his assignments of error and petition for a new trial—in other words, to ensure a thorough review of matters of which Appellant sought review on appeal. Moreover, we note that the scheduling of the *DuBay* proceedings was not left to the whims of the Government but was overseen by a detailed military judge. Furthermore, the Government faced unusual challenges in arranging the *DuBay* hearing. The key witness, KC, was a foreign citizen and resident of Australia. Moreover, she objected to being required to appear in person at the hearing at Fort Leavenworth. *See In re KC*, Misc.

---

[28] The military judge who made rulings on the scheduling of the *DuBay* hearing was not the same military judge who presided over the *DuBay* hearing.

Dkt. No. 2021-06, 2021 CCA LEXIS 593 (A.F. Ct. Crim. App. 9 Nov. 2021) (order). We have considered the difficulties involved in securing the cooperation and travel of a foreign witness not subject to compulsory process during the COVID-19 pandemic. We do not doubt that certain aspects of the process might have been accomplished faster. However, we are not persuaded the delays in this case were so egregious as to impugn public perception of the military system.

We have also considered the factors enumerated in *Gay* and conclude *Tardif* relief for appellate delay is not warranted. Although the delay was extensive, it was largely driven by the effort to ensure Appellant's claims were thoroughly investigated and examined. We find the unusual circumstances of this case are not indicative of bad faith, gross indifference, or institutional neglect, and on balance the other factors weigh against sentence relief.

### III. CONCLUSION

The Petition for New Trial dated 26 April 2021, Misc. Dkt. No. 2021-03, is **DENIED**.

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

CADOTTE, Judge (dissenting):

I respectfully dissent from my esteemed colleagues in the majority regarding their conclusion that trial counsel's clear error—using Appellant's guilty pleas and answers during the providence inquiry to bolster his argument that Appellant was guilty of the contested sexual offenses—was harmless beyond a reasonable doubt. As I am unable to conclude that there was no reasonable possibility that the error contributed to Appellant's conviction, I would set aside the findings of guilty as to the contested specifications and the sentence.

I generally agree with my esteemed colleagues as to their recitation of the facts. I find it significant, that in addition to argument, trial counsel presented demonstrative slides focused on the use of Appellant's pleas in evaluating KC's credibility. Prior to argument, the slides were provided to the trial judge and trial defense counsel. The trial judge queried trial defense counsel if there was an objection to the slides, to which he responded there was none. A portion of the presentation covered credibility. After a slide which included only the word "Credibility" trial counsel presented a slide, which depicted the following:

- Telling the truth about threats

- Telling the truth about her being choked

- Telling the truth about her being threatened with a screwdriver

- Telling the truth about her hit in the back of the head

- Continues to testify even after accused pleads guilty

- Thousands of miles away from her son and home

The crux of my disagreement with my colleagues rests with the application of the presumption that absent clear evidence to the contrary, we presume military judges know and follow the law and are able to distinguish between improper and proper arguments. *United States v. Erickson,* 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted).

At the conclusion of defense counsel's opening statement, the trial judge engaged in an unnecessary colloquy with counsel regarding his "awareness" of the guilty plea as the trier of fact. The trial judge explained he was soliciting the Defense's position on the judge's "awareness" of the guilty plea regardless of whether or not Appellant's pleas had been mentioned in opening statement by defense counsel. The trial judge stated:

> But you had mentioned in your opening statement about the mixed pleas, the guilty pleas, and one of the questions I was going to ask you, regardless of that, is your position -- from the defense team -- on consideration, or the fact-finder being aware that there has been previous guilty pleas?

Ultimately defense counsel responded "yes," after which the judge then asked, "So we're operating in a world where I'm aware of the previous guilty plea?" The trial judge then declared that as the factfinder he was now aware of the plea. I question why the judge even asked the Defense as to whether he, as the factfinder, was "aware" of the guilty plea since this was a judge-alone mixed plea case. I see no valid reason for the trial judge to be "aware" of Appellant's guilty plea in his factfinding role. As the majority points out, Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 2-5-4 (10 Sep. 2014), contains a model instruction that may be used to inform court members of guilty pleas, at the defense's request, in a mixed plea case. As this was not a member's case, it was unnecessary for the military judge to engage on this issue. The fact that he did cuts against the presumption that this military judge knew and followed the law. The judge's agreement that he was "aware" of the guilty plea as trier of fact directly led to Appellant's plea being introduced into the findings case through trial counsel's argument.

Generally, a military judge is not obligated to correct the record regarding what portions of an argument was improper. *Erickson*, 65 M.J. at 225. However, I find, under the circumstances here, the trial judge's failure to correct

the record establishes "clear evidence to the contrary" that the trial judge "knew and followed the law." *Id*. I conclude that when trial counsel directly referred to the judge's prior understanding that they were "operating in a world where [the military judge] know[s] that [Appellant] pled guilty to a number of offenses" and then stated "how that goes towards the victim's credibility," that if the military judge did not agree Appellant's plea could be considered substantively under "awareness" then he was obligated to say so on the record. He did not. I find it significant that trial counsel's argument with regard to Appellant's pleas was not an isolated comment, rather it was one of the central pillars of his argument which was accompanied by demonstrative slides. Under these circumstances, the trial judge was forewarned trial counsel intended to use Appellant's plea to bolster KC's credibility when he was provided a copy of trial counsel's demonstrative aid prior to argument, yet the trial judge did not state on the record the argument fell outside of "awareness" of the plea.

Based on this record, I am unable to conclude trial counsel's argument fell outside the trial judge's understanding of "awareness" of the plea. Consequently, I find that as a result of the judge's failure to correct trial counsel as to what constituted "awareness," that trial counsel's argument was proper in the eyes of the trial judge. As a result, I am unable to presume the trial judge knew and followed the law.

Without applying the presumption the trial judge knew and followed the law pertaining to this issue, I cannot conclude trial counsel's clear error was harmless beyond a reasonable doubt. This "standard is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction." *United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). The entirety of the Government's case on the contested specifications rested on the testimony of KC. Consequently, her credibility was essential to the Government's case. In order to bolster KC's testimony—in error—trial counsel argued the trial judge could consider Appellant's pleas in assessing KC's credibility. I am not confident that this error did not contribute to the trial judge's finding of guilt on the contested specifications, as such, I would set aside the findings and sentence.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court